UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| SRI RANGARAJAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 1:14-cv-01156-SLD-JEH, |
| | ) | 1:15-cv-01163-SLD-JEH |
| CATERPILLAR INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

ORDER

Before the Court are Defendant Caterpillar, Inc.'s ("Caterpillar") motions for summary

judgment, ECF Nos. 47, 51.  Also before the Court are Caterpillar's motion for leave to file

under seal exhibits to the first motion for summary judgment, ECF No. 44; and Rangarajan's

motions for leave to file exhibits to his responses under seal, ECF Nos. 62, 68.  For the following

reasons, the motions for summary judgment are GRANTED, and Rangarajan's case

DISMISSED.  The motions for leave to file are GRANTED.

**BACKGROUND[1]**

**Rangarajan and Caterpillar**

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  The facts related here are taken from the parties' undisputed material facts, Mot. Summ. J. ECF No. 47 5–25, Mot. Summ. J. ECF No. 51 5–25, Resp. Mot. Summ. J. ECF No. 64 12–17, Resp. Mot. Summ. J. ECF No. 71 6–11, from Rangarajan's disputed material facts, Resp. Mot. Summ. J. ECF No. 64 17–28, Resp. Mot. Summ. J. ECF No. 71 11–22, from Rangarajan's additional material facts, Resp. Mot. Summ. J. ECF No. 64 29–39, Resp. Mot. Summ. J. ECF No. 71 23–30, and from the exhibits to the motions and responses.  Where they are taken from elsewhere, or from specific exhibits to the parties' motions, the source is cited.  Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Rangarajan, the non-moving party, and draws all reasonable inferences in his favor.  *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

Caterpillar is "an American corporation that designs, develops, engineers, manufactures, markets and sells machinery, engines, financial products and insurance to customers via a worldwide dealer network." Caterpillar Inc., Wikipedia, https://en.wikipedia.org/wiki/Caterpillar_Inc. (visited Mar. 19, 2017). Rangarajan was born in India, but has lived in the United States since 1991, and is an American citizen. Caterpillar hired him in 1996, and he has worked for Caterpillar ever since.

Caterpillar's Product Development and Global Technology division ("PD&GT") performs engineering services for Caterpillar customers. It operates in North America, India, and China. Caterpillar ranks positions according to salary grade ("SG"). *Schlicksup v. Caterpillar, Inc.*, No. 09-CV-1208, 2010 WL 2774480, at *1 (C.D. Ill. July 13, 2010). On September 1, 2007, Rangarajan became an Engineering Manager-1, an SG 26 position, in PD&GT. He held this position until he was promoted to an Engineering Manager-2, an SG 27 position, on January 1, 2016. Rangarajan's immediate supervisor from January 1, 2013 to April 30, 2015 was Ajay Shankar, also of Indian descent. Shankar was a Director of PD&GT, of whom there were four others: David Damerell, who was white; Brian Sun, Jim Blass, and Lou Balmer. Shankar, Damerell and Sun headed up divisions of PD&GT aimed at the Indian, North American, and Chinese markets respectively, although Rangarajan maintains that Shankar's division actually served a much larger market than the other two, and that it was composed primarily of United States companies.

**The Business Engagement Organization and the Global BE Manager**

In October 2011, Rangarajan started working on a "Six Sigma"[2] project sponsored by Shankar and Damerell. The purpose of this project was to make a proposal for setting up a

---

[2] Managerial jargon for a set of techniques and methods for groupwork in companies. *See* Six Sigma, Wikipedia, https://en.wikipedia.org/wiki/Six_Sigma (visited on March 21, 2017). The phrase is a Motorola trademark. *Id.*

"business engagement organization" that would offer all of the services currently offered by PD&GT in individual markets to a global market. The project leader was Lavanya Ajesh. The other members of the project team besides Rangarajan were Sandy Hoskins and Valerie Wiest, both of whom are white. In April 2012, the project team duly recommended that Caterpillar create the global business engagement organization, and, among other details, recommended that the organization be run by a "Global BE Manager," who would be an SG 27 Engineering Manager-2. This person would be responsible for marketing to all markets the Caterpillar engineering services that had previously been marketed by PD&GT to the Indian, North American, and Chinese markets.

While working on the Six Sigma project, Rangarajan felt that Hoskins and Wiest were hostile toward him and the employees who reported to him. This hostility was manifested at least by Hoskins telling Rangarajan in a 2012 meeting that "none of you guys may have a job," and that Caterpillar would determine whether or not the creation of the global business engagement organization made Rangarajan's India team, and Rangarajan himself, redundant. Rangarajan also believed that Hoskins was hostile toward him based on race because at a meeting in 2010, Hoskins referred to the India engineering team as a "job shop."[3] He believed that Wiest was hostile toward him because in 2011, an engineer working for Wiest had sent her a note stating that Rangarajan made his (the engineer's) life difficult by marketing to customers who were also the engineer's customers. Wiest had supported the engineer, over Rangarajan's objection.

---

[3] Although Rangarajan objects that Hoskins's behavior was part of a "larger pattern," Resp. Mot. Summ. J. ECF No. 64 18, he does not point to any other specific events in the record that cause him to think so. *See* Rangarajan Dep. 87–90, Mot. Summ. J. ECF No. 47 Ex. 1, ECF No. 47-3. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").

In late 2011 or early 2012, Rangarajan ate dinner with Shankar and Ajesh. During dinner, he told Shankar that he wanted to be considered for the Global BE Manager position that, per the Six Sigma project team's recommendation, was going to be created. Shankar told him he would be "a very strong candidate for that," and told him that "we will follow the Caterpillar process. We will find three strong candidates, and we will go from there." Rangarajan Dep. 101, Mot. Summ. J. ECF No. 47 Ex. 1, ECF No. 47-3. Then, on April 17, 2012, Rangarajan met with Damerell to prepare for a meeting with the PD&GT Vice President, at which latter meeting Rangarjan was going to present the Six Sigma project team's recommendation for creating a new global business engagement organization. During the first meeting, Damerell told Rangarajan that "we are looking to elevate you to the global business engagement manager position." *Id.* at 77. Rangarajan expressed his interest in the position, and said that he was well qualified, in part because the job was similar to the one that he currently did in Shankar's division of PD&GT. Damerell said "that's fine." *Id.* In May or June 2012, Rangarajan spoke with Shankar on the telephone and asked when Caterpillar would hire the new manager. Shankar said that they were still working on it, and Rangarajan once again expressed his interest in the position. At some point, Rangarajan also asked Sun about when the position was going to be filled, and Sun said that Shankar and others were working on it.

**PCPP Hiring at Caterpillar**

Caterpillar fills some of its open management positions, including the one relevant here, by a "Priority Candidate Placement Process" ("PCPP"). The PCPP puts priority on "current support or management Caterpillar employees who do not have or are at risk of not having a job due to reduction in force or position elimination . . . ." Haig Decl. 2, Mot. Summ. J. ECF No. 47 Ex. U, ECF No. 47-22. It also puts priority on "[f]ull time support or management employees

who may be in need of a position that better matches his/her skill set." PCPP, Resp. Mot. Summ. J. ECF No. 64 Ex. E 5, ECF No. 63. Candidates for the PCPP must have satisfactory or higher performance ratings. *Id.*; Haig Decl. 2.

The PCPP works by requiring hiring managers to consider minimally qualified candidates from the pool of PCPP candidates before they consider other candidates within Caterpillar. *Id.* If a PCPP candidate meets the minimum qualifications for a position, the hiring manager *must* hire the PCPP candidate for the position. *Id.* If no PCPP candidate meets the minimum qualifications for the position, then, Caterpillar asserts, the position is posted internally for other candidates within Caterpillar to apply for. *Id.* Rangarajan asserts, without citing to the record beyond his own deposition testimony and affidavit, that SG 26 positions and higher were not posted internally until February 2015, and that PD&GT positions were filled via another process if they were not first filled by PCPP candidates.

**The Global BE Manager is Hired**

Damerell was in charge of making the ultimate decision about who should be hired for the Global BE manager position. In 2012, Caterpillar's human resources organization told Damerell to consider Greg Ferkol, who is white, for the Global BE manager position. This was because Ferkol was an international service employee ("ISE") who was returning to the United States after working overseas. Caterpillar claims that, pursuant to a letter of understanding between the PD&GT division and ISEs within PD&GT, PD&GT must consider an ISE for any open positions within the division when the ISE's international assignment ends.[4] Damerell reviewed Ferkol's personnel documents and decided to interview him, but after interviewing him

---

[4] Rangarajan points out that Caterpillar has not produced this letter of understanding, but does not dispute its existence. He disagrees with the way that Caterpillar applies this policy, but does not contest that it does apply the policy in the way described here—with ISE candidates being considered for any open position when they return from an overseas job. *See* Resp. Mot. Summ. J. ECF No. 64 21–22.

in July 2012, along with Sun and Shankar, decided that he would not be a good fit for the position and declined to hire him.

In January 2013, Damerell authorized a job requisition for the Global BE manager position. As a result, a job description of the position was prepared. This description stated that the Global BE manager should have at a minimum: a bachelor's degree, ten years of experience at Caterpillar, effective verbal and written communication skills, the ability to negotiate and arrive at "sound enterprise decisions," strong interpersonal skills, "being a self starter," the ability to work beyond organizational boundaries, the ability to grow and lead a diverse team, and a high level of business acumen. Hoskins Decl. Ex. A, Mot. Summ. J. ECF No. 47 Ex. T, ECF No. 49. Pursuant to the PCPP, Caterpillar did not at this time advertise the job internally. Caterpillar's human resources organization identified three PCPP candidates for the position: James Witte, Wade Samson, Chad Heltemes, all of whom are white.

Damerell asked Hoskins to review these candidates to see if they met the minimum requirements for the Global BE manager. Hoskins reviewed the résumés of Witte and Heltemes, and all three of the applicants' employee datasheets. Hoskins also spoke with Heltemes's supervisor, Frank McCracken, who told her that he would not be a good fit for the Global BE manager position because he did not have strong sales and marketing skills. Hoskins also spoke to Samson's supervisor, Rebecca Downing, who told her that Samson did not have the requisite skills for the position. Finally, Hoskins spoke with Witte's supervisor, Brian Yoder, who told her that Witte was good at working with others, and could bring disagreeing groups of employees together. Hoskins also spoke to two of Witte's other supervisors, who told her that Witte had a "solid background," was good with people and at negotiating, and would be a good

fit for the position. Hoskins Decl. 2. Hoskins determined that Witte was the only qualified candidate, and relayed all of this information to Damerell.

Witte had earned a BS in Manufacturing Engineering and a MS in Manufacturing Systems from the University of Wisconsin, Madison. Caterpillar had hired him in 1988. Over the years, he had worked for Caterpillar as a manufacturing systems engineer, facilities engineer, field sales representative, customer account manager, project lead for a hydraulic systems project, quality manager, and supervisor of an enterprise cost reduction team. He had been placed in the PCPP pool because in January 2013, roughly contemporaneously with the job requisition for Global BE manager, Caterpillar eliminated his position.

In February 2013, Wiest, Hoskins, and Randy Huber, another Caterpillar employee, interviewed Witte for another job internal to Caterpillar for which he was eligible via PCPP, a Virtual Manufacturing Engineering Manager. Wiest testified at her deposition that she "declined on him as a fit for the role because he didn't have the skill set for that particular job," by which she meant, "[h]e did not have the experience in engineering and in manufacturing that were necessary for the role." Wiest Dep. 31, Mot. Summ. J. ECF No. 47 Ex. Q, ECF No. 47-18. Witte described the interview this way: the interviewers "said, You've done very well in the interview. We believe we have – and you would be very well qualified for this position, but we have another position which we think you'll also be qualified at. That was the global business engagement manager position." Witte Dep. 22, Mot. Summ. J. ECF No. 47 Ex. R, ECF No. 47-19. Two days later, Witte met with Hoskins to talk about the Global BE manager position, and Hoskins told Witte that if he was interested, she would arrange an interview. Two days later Witte told Hoskins that he was interested in the position, and Damerell, Shankar, and Sun interviewed him for the position shortly thereafter. After the interview, Damerell decided to hire

Witte for the Global BE manager position. Shankar and Sun concurred in the decision, and Witte filled the position on March 1, 2013.

**Rangarajan Complains and Caterpillar Investigates**

Around January 13, 2013, Kamakshy Velayudhan, a Human Resources Manager, had told Rangarajan that "boss . . . [had] decided that this [Global BE manager] position must be filled by a local U.S. native." Rangarajan Dep. 128. Shankar, who was Velayudhan's superior, testified that he did not remember making such a statement, but that had he said it, he would have meant that the position should be filled by someone based in the United States, because most of Caterpillar's customer base is there. Shankar Dep. 49–50, Mot. Summ. J. ECF No. 47 Ex. M, ECF No. 47-14.

Around April 17, 2013, Rangarajan met with Shankar at Shankar's office in Chennai, India. Rangarajan asked Shankar why Rangarajan had not been given the opportunity to interview for the Global BE manager position. Shankar told Rangarajan "you need cream with your coffee," and to "just keep doing your job." Rangarajan Dep. 155–56. On April 22, 2013, Rangarajan sent an email to Shankar stating that Damerell had abused his position in PD&GT to deny Rangarajan advancement opportunities, and threatening litigation. Rangarjan Dep. 195–96. On July 18, 2013, Rangarajan sent another email to Shankar, complaining of more or less the same thing, and adding that Damerell and a few managers of his had also blocked Rangarjan's efforts to get other jobs within Caterpillar. Rangarajan Dep. 206–07. He also alleged that Damerell's organization did not reflect the diversity of inclusion that would be expected of a company such as PD&GT. *Id.* at 212. He also complained that two other employees who did work similar to him had SG 27 positions, while he still had an SG 26 position. *Id.* at 217.

On July 19, 2013, Rangarajan sent an email to PD&GT Vice President Gwenne Henricks complaining about minority staffing issues at PD&GT. The email alleged that minorities who conformed to managers' views of how things should work had advancement opportunities, while those who did not conform, like Rangarajan, did not; that the leadership was not diverse, that Hoskins had made the "job shop" comment, and that Rangarajan had not been promoted to the Global BE manager position because of his nonconforming views. Henricks forwarded this email to Human Resources Manager Suzanne Kisby, who investigated the complaints. As part of her investigation, Kisby interviewed Damerell, Shankar, and Hoskins. Damerell told Kisby that he had hired Witte because he was a PCPP candidate who met the minimum qualifications. Kisby met with Rangarajan on January 22, 2014, and told him that she had determined that Witte was properly promoted to the Global BE manager position.

**Reorganization and Rangarajan's First Lawsuit**

On August 9, 2013, Damerell told Witte that Witte was not meeting expectations, and that Damerell thought the poor performance was the results of a skills mismatch with the position, which Caterpillar had now decided to eliminate. Witte was placed back in the PCPP pool, and ultimately, on October 30, 2013, hired back within Caterpillar at an SG 24 position.[5] Witte Dep. 45–46.

On November 13, 2013, Rangarjan filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC"), alleging race and national origin discrimination by Caterpillar for not promoting him to the Global BE manager position. He also alleged that Caterpillar had retaliated against him for complaining by removing him from an

---

[5] Rangarjan claims that Witte remained in the Global BE manager position until October 30, 2014. Resp. Mot. Summ. J. ECF No. 71 24. But this contradicts Witte's testimony, and Rangarajan's only support for the assertion is citation to Caterpillar's statement of undisputed material facts in their second motion for summary judgment, which do not support Rangarajan's different view.

organization chart and harassing him. On February 24, 2014, the EEOC declined to investigate further and issued a right to sue letter. Compl. Ex. 2, ECF No. 1-2. Rangarajan filed the instant lawsuit on April 24, 2014, alleging discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 ("Title VII"), Counts I–II, and under 42 U.S.C. § 1981, Count III, specifically for Caterpillar's failure to promote him to the Global BE manager position on account of his race (Asian) and national origin (Indian).

**Caterpillar Reviews Salaries**

This was not the end of it, however. When Caterpillar reorganized PD&GT in January 2014, all of the teams that had reported to Damerell and some of the teams that had reported to Sun began reporting to Shankar. Since Rangarajan worked for Shankar, this meant that Rangarjan was now responsible for engineering services performed in India, the United States, and China.

In the first quarter of 2014, Henricks asked the human resources organization to do "a thorough review" of the employees who reported to a PD&GT director.[6] The review was undertaken because the employment structure in PD&GT had recently changed, as described above. Cignetti Dep. 32, Mot. Summ. J. ECF No. 51 Ex. S, ECF No. 51-20. It was specifically a review of salary grades. Cignetti Decl. 1, Mot. Summ. J. ECF No. 51 Ex. BB, ECF No. 51-29. Human Resources Manager Stacey Cignetti, who is white, was the coordinator for this project. She asked each employee whose salary was being reviewed to submit a description of his or her job duties. She sent out job description templates that included each employee's current job description, and the job descriptions for one salary grade above and below for purposes of

---

[6] Rangarajan lists many objections to Caterpillar's assertion to this effect, but does not appear to dispute that it is directly supported by deposition testimony, or offer any competent evidence to suggest that it is materially disputed. *See* Crain Dep. 5, Mot. Summ. J. ECF No. 51 Ex. V, ECF No. 51-23; Cignetti Dep. 5,11, Mot. Summ. J. ECF No. 51 Ex. S, ECF No. 51-20.

comparison. Cignetti Decl. 2. The template contained a space for the employee to describe his or her actual job responsibilities. Cignetti asked all the employees not to modify the template and to fill out only the space provided on the template. Cignetti Dep. 15.

Rangarajan filled out and sent back his template. He also sent a separate email to Cignetti claiming that three other employees who had had jobs similar to his in the past had held SG 27 positions. Cignetti reviewed Rangarajan's template, Cignetti Dep. 12, by comparing Rangarajan's description of his job duties to the duties of SG 25, 26, and 27 engineering manager positions, in order to determine if his then-SG 26 Engineering Manager-1 position was consistent with his actual job duties. Based on her review, Cignetti determined that Rangarajan's job responsibilities appropriately matched the SG 26 Engineering Manager-1 position that he held. Cignetti subsequently met with other job evaluators and with Shankar to review her findings. Shankar asked that they be send to Mary Crain, a Senior Corporate Job Evaluator, for final review. Crain concurred with Cignetti in her evaluation of Rangarajan's job responsibilities. Cignetti then gave her recommendations to Henricks and each Director, including Shankar. Henricks and Shankar approved Cignetti's recommendation to keep Ragnarajan at an SG 26.

As a part of the salary review, six other employees who worked for Shankar were reviewed: Hoskins, an SG 28, and white; Wiest, an SG 28, and white; Nilesh Shah, an SG 24 and Asian; John Norlin, an SG 26 and white; Asokan Manivelu, an SG 26 and Asian; Ramalingham Venkatesan, an SG 26 and Asian. Shah, Norlin, and Manivelu were promoted to higher salary grades: Shah to an SG 26, Norlin to an SG 27, and Manivelu to an SG 27.

**Hoskins Misbehaves**

On March 27, 2015, Hoskins approached Rangarajan in Peoria outside a conference room and asked him about reserving a conference room for an upcoming meeting. Rangarajan replied

11

that it was not his meeting, and was being handled by another Caterpillar employee. Hoskins

grabbed Rangarajan by the lapels, shook him, and told Rangarajan that he did not care about his

boss. Rangarajan testified that Hoskins "kind of got pretty upset," Rangarajan Dep. II, Mot.

Summ. J. ECF No. 51 Ex. E, ECF No. 51-6, while Hoskins testified that she was "trying to tease

him a little bit." Hoskins Dep. 31, Mot. Summ. J. ECF No. 51 Ex. R, ECF No. 51-19.

Rangarajan stated that another employee was handling the meeting, and after saying that she was

surprised, Hoskins walked away. Later that day, Rangarajan reported the incident to Bansidhar

Phanasalkar, a superior. Phanasalkar had no reaction.

On March 31, 2015, Rangarajan visited Caterpillar's Aurora, Illinois facility with his

team members, who included Phanasalkar and Hoskins. During the visit, Rangarajan went to

check his email at a visitor terminal. As he did so, Hoskins approached him, visibly upset, and

said "I want to slap you and Nilesh." Rangarajan Dep. II 119. (Nilesh was another Caterpillar

employee.) Rangarajan rolled his chair away from Hoskins, and she told him to "stop sending all

these e-mails." *Id.* at 120. The two then discussed an email exchange from earlier in the day

relating to an engineering team at another Caterpillar facility. Hoskins left. That day,

Rangarajan reported to Phanasalkar that Hoskins had threatened him. Phanasalkar told

Rangarajan that he and Hoskins needed to work this out between themselves. The same day,

Rangarajan also reported Hoskins's slap comment to his supervisor, Shankar, and a human

resources manager, but heard back from none of them.

On April 1, 2015, Rangarajan interviewed a candidate for a position in his office.

Another Caterpillar manager was there, and Rangarajan had invited Hoskins, but she had not

showed up. During the interview, however, she came into Rangarajan's office and suggested

that they move to her office. Ranagarajan instead offered Hoskins a chair in his office, and

proceeded to ask the candidate about being able to work with others. Hoskins broke in and said "Sri has no accountability, and Sri has no responsibility." Rangarajan Dep. II 124. Rangarajan ignored the comment, but later reported her conduct to Henricks in an email, and added that he was concerned for his safety. Henricks responded the same day, saying that she had informed the proper people about Rangarajan's concerns. She also told him to ensure that someone else was present if he met with Hoskins for any reason.

Corporate Human Resources Manager Victoria Barron investigated Rangarajan's complaint. Based on her investigation, she recommended to her supervisor that Hoskins be suspended for two weeks, demoted, and removed from Rangarajan's work group. On June 1, 2015, Caterpillar demoted Hoskins from an SG 28 Engineering Manager-3 position to an SG 26 Engineering Tech Team Lead position because she had violated "Caterpillar's Values in Action." Rangarajan also asked that his office be moved so that he sat farther away from Hoskins. The request was granted. Hoskins has since retired.

**Rangarajan's Second Lawsuit**

On March 11, 2015, Rangarajan filed a discrimination charge with the EEOC against Caterpillar, alleging that Caterpillar had discriminated against him on the basis of race and national origin by failing to promote him in May 2014. On March 26, 2015, the EEOC declined to investigate further and issued a right to sue letter. *See* Compl. Ex. 2, *Rangarajan v. Caterpillar Inc.*, 1:15-cv-01163 (C.D. Ill. 2015), ECF No. 1. On April 21, 2015, Rangarajan again sued Caterpillar, again alleging failure to promote under Title VII and 42 U.S.C. § 1981, Counts I–II, V, Compl. 7–9, 11–13, *Rangarajan v. Caterpillar Inc.*, 1:15-cv-01163 (C.D. Ill. 2015), ECF No. 1, and adding a retaliation claim, Count III, *id.* at 9–10, on the basis of his race (Asian) and national origin (Indian). He also alleged "Coercion, Intimidation, Threats, or

Interference," without identifying a particular statutory violation, as a result of Hoskins's behavior toward him. *Id.* at 11.

Discovery proceeded in both cases, and on July 24, 2015, the Court consolidated them. ECF No. 35. Caterpillar moved for summary judgment on all claims in both cases, and the motions are fully briefed and ripe for ruling.

## DISCUSSION

### I. Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "However, neither 'the mere existence of *some* alleged factual dispute between the parties,' nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a [properly supported] motion for summary judgment." *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 247, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the

record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## II.     Analysis

Rangarajan's claims are (a) that Caterpillar failed to promote him to the Global BE manager position in March 2013, in violation of Title VII and section 1981, as alleged in his first complaint; (b) that Caterpillar failed to promote him to an SG 27 position in May 2014, in violation of Title VII and section 1981, as alleged in the second complaint; (c) that Caterpillar retaliated against him by failing to promote him in the latter instance in violation of Title VII and section 1981, and (d) that Hoskins's behavior toward him amounted to discriminatory harassment by Caterpillar under Title VII and/or section 1981. The Court discusses Caterpillar's challenge to each claim below.

### a.   Failure to Promote – Global BE Manager

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A failure to promote claim under Title VII requires a plaintiff to show that "the basis for . . . [an adverse employment action] was the impermissible consideration of race, i.e. that a person of another race would not also have been [adversely affected] under similar circumstances." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992). "To proceed to trial on a failure to promote claim [at summary judgment], a plaintiff either must produce 'sufficient direct or circumstantial evidence that [the employer's] promotion decisions were intentionally discriminatory or make an indirect case of discrimination' under the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Riley v. Elkhart Cmty. Sch.*,

829 F.3d 886, 891 (7th Cir. 2016), *cert. denied* (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 735 (7th Cir. 2014)).

The Seventh Circuit has recently made clear that a "direct" case of intentional discrimination at summary judgment simply means a showing that, considered as a whole, "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."[7] *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A failure to promote claim under the indirect method of *McDonnell Douglas* requires a plaintiff to make a prima facie showing that "1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected for that position[,] and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). Once a plaintiff has made this showing, the burden shifts to the defendant to offer a nondiscriminatory reason for the employment action. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008). If he does so, the burden shifts back to the plaintiff to show that the offered explanation is pretextual. *Id.*

Section 1981, a reconstruction-era civil rights law, protects the rights of "[a]ll persons within the jurisdiction of the United States . . . to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). It permits both discrimination and retaliation actions. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454–55 (2008). "Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996). While section 1981 claims do not lie when discrimination is alleged to be on the basis of national origin, they

---

[7] The point is that there is no difference in applicable legal standard between a court's consideration of direct and circumstantial evidence. *Ortiz* leaves in place burden-shifting frameworks like *McDonnell Douglas*. *Ortiz*, 834 F.3d at 766.

do when it is alleged to have been racially motivated. *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984). Since in every instance, Rangarajan's claim appears to be that he was discriminated against on the basis of both race and national origin, the Court will analyze his discrimination and retaliation claims under Title VII and section 1981 at the same time.

Caterpillar argues that Rangarajan's claim fails under both direct and burden-shifting methods of proof because he never applied for the Global BE manager position, Mot. Summ. J. ECF No. 47 27–29; that Rangarajan cannot show sufficient evidence under the direct method from which a jury could infer an impermissible racial motive behind Caterpillar's actions, *id.* at 29–31; that under the burden-shifting method, he cannot show that a less qualified employee got the position, *id.* at 31–33; and that he cannot show that Caterpillar's offered reason for picking Witte and not picking him is pretextual, *id.* at 33–36. Rangarajan responds that while he was not able to apply for the position, he expressed his interest in it, Resp. Mot. Summ. J. ECF No. 64 40–41; that his offered evidence of discriminatory motives at Caterpillar could convince a jury to find discrimination had occurred, *id.* at 42–49; and that Ferkol and Witte were less qualified than he was, *id.* at 50–61. Rangarajan asserts that his claim should survive summary judgment under both direct and burden-shifting methods of proof.

  **i. Burden-Shifting Method**

Turning first to the burden-shifting method, and Rangarajan's prima facie case, he is correct that it is not always necessary to have applied for a promotion that one alleges was awarded on a discriminatory basis. For instance, when an employer "does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion," *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994), all a plaintiff need do is "[allege] that the employer's decision not to approach people of her status was itself illegitimately motivated

and [show] that but for such a practice she likely would have been approached," and that she would have taken the job if offered it, *id.* This is because the prima facie phase of a *McDonnell Douglas* analysis is not intended to be applied mechanistically, but, rather, reflects "standing-like concerns" intended to ensure that the plaintiff's allegations of discrimination are even possible. *Id.*

> More particularly, [the prima facie case requirement] closes the causal gap between the employer's decisionmaking process and the complained-of condition of the employee, thus allowing a tentative inference of bad motive on the employer's part. That is, only if the plaintiff would realistically have been in the running for the job absent the alleged discrimination will the tentative assumption that her current plight was caused by illegal discrimination be justifiable.

*Id.* The facts show that Rangarajan eagerly and frequently communicated his interest in the manager position—to Shankar in late 2011 or early 2012, to Damerell on April 17, 2012, to Shankar in May or June 2012, and at some point to Sun. Even without a formal application process in place, Rangarajan made it clear to those responsible for filling the position that he was interested. It is clear that if he had been offered the opportunity to apply, he would have done so. The question, as to whether Rangarajan has made out the second requirement of his prima facie case, must therefore be whether Rangarajan has adequately shown that he would have been in the running for this position, but for some discriminatory hiring decision that caused the job to be offered to someone else. *Loyd*, 25 F.3d at 523.

However, Rangarajan he has not shown that Caterpillar's hiring process, qualified by the PCPP, could have resulted in his being offered the job, absent the racism that he alleges. In *Loyd*'s terms, he has not closed the causal gap between Caterpillar's decisionmaking process and his not getting hired by showing that, had the process been managed in a non-racist way, he would have had the opportunity to apply for the position.

Caterpillar describes the PCPP as a program designed to help employees who have lost their job or are in danger of losing it find another job at Caterpillar. Rangarajan complains that he was not considered officially for the position, and points our repeatedly that, in his view, he was more qualified for the Global BE manager position than were either Ferkol and Witte; and he complains bitterly that it is an unfair and unwise policy. Resp. Mot. Summ. J. ECF No. 64 47–48. But he does not contend that the PCPP is itself an illegitimately, i.e. racially motived policy. *See Loyd*, 25 F.3d at 523. Nor does he contest that the PCPP is consistently applied in other cases, that it was applied in this case, or that its rules, as applied to the filling of the Global BE manager position, mandated that Witte get the job. Witte was a member of the PCPP pool because he had just lost his job at Caterpillar; he met the minimum qualifications of the Global BE manager position; he was awarded the job. Rangarajan could not have applied for the position, and so need not show that he did apply to make out the second part of a prima facie case. But he has not alleged that the PCPP program itself was illegitimately motivated, and cannot show, as he must, that his inability to apply for the job was the result any practice on Caterpillar's part of not approaching people "like himself." *Loyd*, 25 F.3d at 523. *Cf. Simple v. Walgreen Co.*, 511 F.3d 668, 670 (7th Cir. 2007) (holding prima facie case of discrimination was made where defendant drugstore knew of plaintiff's interest in a position but hired a white woman for it instead without notifying him). This is insufficient to show that Rangarajan would "realistically have been in the running for the job absent the alleged discrimination," *Loyd*, 25 F.3d at 523, and so, insufficient to make out a prima facie case.

Even if Rangarajan had made out a prima facie case, he has not offered evidence that Caterpillar's offered nondiscriminatory reason for not hiring him—that the company was following the PCPP rules—is pretextual. "Simply put, pretext is a lie—'a phony reason for some

action.'" *Riley*, 829 F.3d at 894 (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015)). Here, where the offered reason for Caterpillar's action is that the action was mandated by policy that the company did in fact employ, Rangarajan's offered evidence would have to be something showing that the policy had itself been employed for scurrilous reasons, as a cover-up for actual, impermissibly racist motivations. But he shows only evidence that, even construed in the light most favorable to him, would not be sufficient for a jury to find that the PCPP had been employed as a pretext.

As evidence of pretext, Rangarajan points to the gap of time between Ferkol's consideration and rejection for the position; the fact that Witte was told that he would be "very well qualified" for the Virtual Manufacturing Engineering Manager job, but was invited to interview for the Global BE manager position instead; his more general notion that the PCPP is a senseless policy and without legitimate business purpose; and his theory that when Ferkol was considered for the job, Caterpillar did or should have also run its PCPP hiring process, rendering its actual use of the process a second and pretextual effort. All of these are supposed to show, presumably, that Caterpillar was casting about for ways to hire someone other than himself, by delaying and employing alternative methods to look for someone else in the meantime.

First, the evidence shows that Ferkol was referred to Damerell and his team by human resources well before Damerell et al began searching for candidates for the position. This is consistent with Caterpillar's description of the way that ISE candidates are treated, and not with a scenario in which, as Rangarajan implies, Caterpillar was working actively to find white or non-Indian candidates instead of allowing him to apply or offering him the job.

Second, Witte's testimony that he was told he would be "very well qualified" for the Virtual Manufacturing Engineering Manager job must be viewed in its context. Witte had just

been interviewed by a panel of three managers—Wiest, Hoskins, and Huber—who were filling

that position, and declined to fill it with Witte, despite what they said to him.  Wiest later stated

that, in fact, Witte was not a good fit for the job.  They did refer him, however, to the other PCPP

job then available, the Global BE manager position, where he was determined by a different

interview panel—Damerell, Shankar, and Sun—to be minimally qualified for the position.  This

sequence of events is consistent with Witte's being minimally qualified for the BE Manager

position and not for the Virtual Manufacturing Engineering Manager position, and is not

consistent with a sinister plan on the part of Caterpillar managers to shunt Witte, white, into a

position that might otherwise be filled by Rangarajan, Asian.[8]  Furthermore, internal emails

between Hoskins and Shankar, Sun, and Demerell show nothing other than a hiring process

consistent with the PCPP.  *See* Jan. 25, 2013 Email, Hoskins Decl. Ex. H, ECF No. 58.

Third, while Rangarajan may think the PCPP ill-advised—"analogous to the unfortunate

shortage of lifeboats on the Titanic," Resp. Mot. Summ. J. ECF No. 64 47—criticism of its

consequences as a policy does nothing to suggest that it is used for cover when Caterpillar

secretly wishes to fill a position with an unqualified white candidate, or was so used on this

occasion.

Fourth, Rangarajan offers nothing other than his suspicions to support the claim that

Caterpillar was under some obligation to find members for its PCPP pool at the time when

human resources asked Damerell to interview Ferkol.

A jury could not infer that Caterpillar's offered reason, the PCPP, was pretextual.

Rangarajan's case fails under the burden shifting method for this reason as well.

---

[8] This sequence of events would only be consistent with Rangarajan's theory if the hiring team for the Virtual Manufacturing Engineering Manager job had colluded in secret with the hiring team for the Global BE manager position.  Aside from the fact that Rangarajan offers no evidence to support this theory, it is further belied by the fact that Shankar stated in his deposition, when asked about the Virtual Manufacturing Engineering Manager job: "Virtual manufacturing manager position.  I don't even know what that is."  Shankar Dep. 48.

ii.	**Direct Method**

No reasonable jury could infer, on the basis of all the admissible evidence in the record, that the Global BE manager job was offered to Witte instead of Rangarajan for an impermissible motive.  As explained above, there is insufficient basis for a jury to infer that Rangarajan was deprived of the opportunity to apply for the job by a racist policy, or to infer that Caterpillar's stated reason for offering the job to Witte was pretextual.  None of the rest of the evidence suggests that race or national origin played an impermissible role in Rangarajan's not receiving the job.[9]

- Velayudhan's statement, as reported by Rangarajan, that "boss" had decided the Global BE manager must be filled by a "local U.S. native" would not be admissible.  *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."); Fed. R. Evidence 801(c) (hearsay is an out of court statement offered for its truth); *id.* 801(d)(2) (opposing party statement not hearsay); *id.* 805 (hearsay within hearsay only permissible if each statement conforms with an exception to the hearsay rule).

- Shankar's statements, in response to Rangarajan's question about not being hired, that "you need cream with your coffee" and to "just keep doing your job" are elliptical at best, without more.  Rangarajan wants the phrase to be a metaphor about race, and not only that, but a statement describing Caterpillar's impermissibly racist motives, as

---

[9] Given the Court's analysis above, if race had nevertheless played a role in Caterpillar's decision, this would be a "mixed-motive" case, in which both permissible and impermissible motives played a role in the defendant's behavior.  Liability can still accrue in such circumstances.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989).  Logically, however, a plaintiff's argument that an impermissible motive coexisted with a permissible one would have to be shown directly, rather than via a burden-shifting approach, since a legitimate non-pretextual reason could, by hypothesis, be offered.  *Grigsby v. LaHood*, 628 F.3d 354, 360 (7th Cir. 2010).

understood by Shankar and intentionally conveyed to Rangarajan.[10]  Presumably the implication is that a white employee was needed in an otherwise largely Indian workforce.  But Rangarajan supplies no context to think that this reading would be accurate, instead arguing that Caterpillar's management positions, at least, are predominantly filled by whites.[11]  Even accepting this racialized reading, it is far from clear whether the statement was offered to describe the hiring process that Caterpillar actually engaged in, or rather, as Rangarajan himself suggested, that Shankar was "just encouraging [him] not to dwell on what had happened."  Rangarajan Dep. 158.

- Rangarajan's assertions to the effect that Caterpillar's management underrepresents minorities are wholly unsupported by record evidence.

- Rangarajan states that Damerell is biased against Asian employees because in 2007, Damerell told Rangarajan to move out of his cubicle, and believes that Damerell told him to do this because Rangarajan was "the only colored guy in the whole cube."  Rangarajan Dep. 175–76.  When Rangarajan returned to the space several months later, Damerell had a closed-door office and a white employee was sitting where Rangarjan had formerly been placed.  *Id.*

Rangarajan's evidence for racial or national origin bias in Caterpillar's hiring process, in other words, comes down to Shankar's obliquity, and an incident where Damerell asked him to move his desk five years before the events in question.  Taken as a whole, this is insufficient evidence to support a jury's finding of liability under Title VII or section 1981 for Caterpillar's decision to hire Witte for the Global BE manager position rather than Rangarajan.

---

[10] Rangarajan stated in his deposition that he took the statement to mean that "[y]ou need Caucasian people with colored people for doing this kind of job."  Rangarajan Dep. 158.
[11] When asked about this at his deposition, Shankar said he did not remember saying this, but allowed that "[i]t could mean white person versus nonwhite."  Shankar Dep. 46.

Since Rangarajan cannot succeed via direct evidence or the burden-shifting approach, his failure to promote claims arising from the Global GE manager position must be dismissed.

### b. Failure to Promote – SG 27 Position

Caterpillar argues that Rangarajan did not suffer a materially adverse employment action in not being promoted to an SG 27 position in May 2014, Mot. Summ. J. ECF No. 51 27–28; that there is insufficient evidence to infer directly that Caterpillar failed to promote him on this occasion for impermissible reasons, *id.* at 28–29; that he cannot establish a prima facie case under the indirect method, *id.* at 29–32; and that he cannot establish pretext, *id.* at 32–34. Rangarajan responds that the failure to promote him was an adverse employment action, Resp. Mot. Summ. J. ECF No. 71 31–32; points to the evidence of discrimination upon which he rested his previous failure to promote claim to show direct evidence of discrimination here, *id.* at 32–34; and claims he has made out a prima facie case, *id.* at 34–41.

### i. Burden-Shifting Method

First, it is important to be clear about what kind of claim Rangarajan makes about the failure to advance him to an SG 27 position. Rangarajan's claim is not that he was not offered a job position or promotion, but that his pay was not raised to the SG 27 level when Caterpillar reviewed salaries of managerial staff. Changes in job responsibilities, insofar as they had occurred, had already happened by the time Caterpillar undertook its review; Rangarajan's argument is that he ought to have been bumped up on the pay scale because his job responsibilities merited more pay after the restructuring, and Caterpillar ought to have recognized this.

Viewed in this light, Caterpillar's argument that its refusal to raise his pay was not an adverse employment action fails. An adverse employment action is "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Although denial of a raise is not, considered directly, a "significant change" in employment status, courts have consistently held that failure to give a raise can constitute an adverse employment action. *See, e.g.*, *Whigum v. Keller Crescent Co.*, 260 F. App'x 910, 914 (7th Cir. 2008) ("The receipt of an inadequate pay raise can, though, amount to an adverse employment action[.]"); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("[T]he denial of a raise can constitute a materially adverse employment action if a raise would have been an expected element of the employee's salary and its denial cuts the salary in real terms."). Here, Rangarajan's not being classified as an SG 27 cost him a five percent raise, along with various losses of fringe benefits like stock options, retirement benefits, and insurance. Resp. Mot. Summ. J. ECF No. 71 32. This is sufficiently materially adverse to make out a prima facie case.

However, Rangarajan still fails to make out a prima facie case because he cannot show that similarly situated individuals outside of his protected class were treated more favorably. "In the usual case a plaintiff must at least know that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). It must be remembered that, since what is at issue is Caterpillar's willingness or unwillingness to pay employees more after evaluating whether their actual job responsibilities merit the pay bump, a "similarly situated" employee to Rangarajan would be not just an employee who was an SG 26 and was promoted to an SG 27, but who performed substantially the same job

responsibilities as Rangarajan did, but was rewarded with a pay raise where Rangarajan was not, or who, after review, kept at an SG 27 position he or she had previously occupied.

As comparators, Rangarajan points to Witte, Brian Jensen, and Stacy Smith. *See* 1:15-cv-01163 Compl. 7–8. But Witte did not have the same supervisor as Rangarajan, and moreover, at the time had already been placed in an SG 24 position. Brian Jensen was an SG 27 employee, and remained so for the PD&GT pay raise of 2014, but he reported to Damerell. Cignetti Decl. 4. He was responsible for governance of all of PD&GT's services, rather than only Shankar's group. Rangarajan Dep. II 84–85. And Smith, who was an SG 26, reported to Craig Brabec, and did not receive a salary upgrade as part of the 2014 PD&GT salary review. Witte was two salary grades below Rangarajan, and so is not a suitable comparator. Jensen was an SG 27, and determined during the 2014 review to be at the appropriate pay scale, but his job was materially different from Rangarajan's. He had a different supervisor, performed business engagement work with all of PD&GT's clients, rather than just those served by Shankar's group, and he reported to and interacted with different levels of Caterpillar personnel than did Rangarajan. Rangarajan Dep. II 84–85. And Smith, who reported to a different supervisor, like Rangarajan did not receive a pay upgrade from SG 26 to SG 27 during the 2014 salary review. The similarly situated analysis is designed to "eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel . . . .'" *Coleman*, 667 F.3d at 846 (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). Here, the analysis shows that these other employees had differing roles, or indeed, did not receive better treatment than Rangarajan. His prima facie case fails.

  **ii.**  **Direct Method**

For similar reasons, Rangarajan's offered evidence is insufficient for a jury to conclude that he was not upgraded to an SG 27 position because of prohibited animus. The evidence of animus that Rangarajan offers is the same as the evidence that he offered to support his first failure to promote claim, which, as the Court has already explained, is insufficient. Indeed, the record shows that of the other six employees working under Shankar whose salaries were reviewed in 2014, three were given a raise, and two were Asian; one of them was upgraded from an SG 26 to an SG 27 position.[12] There is no other evidence in the record that the salary grade review was conducted in a discriminatory manner, or that its results demonstrated a racially disparate effect. Rangarajan complains that Cignetti, in conducting the review for the human resources organization, did not make a sufficient effort to understand how valuable his job duties were. Resp. Mot. Summ. J. ECF No. 71 25. But simply because the human resources organization disagreed with Rangarajan's obvious desire for a raise does not mean that it had a nefarious motive for doing so. In addition, Rangarajan eventually received his long-sought raise to an SG 27 position, making his claim that Caterpillar refused to give him one on the basis of race or national original all the less plausible. Rangarajan's claim for failure to promote on the basis of the 2014 salary grade review fails.

### c. Retaliation – SG 27 Position

Rangarajan alleges that the failure to promote him to an SG 27 position was also an act of retaliation for his EEOC complaint and subsequent lawsuit. Under Title VII, employers are prohibited from discriminating "against any . . . employee . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). A plaintiff may, as with a discrimination action, proceed by the direct or burden-shifting method.

---

[12] If Norlin, who was white and was upgraded from an SG 26 to an SG 27 position, was shown to have sufficiently similar job responsibilities to Rangarajan, then he might have been an appropriate comparator. But the record contains no information about how Norlin's job responsibilities compared to Rangarajan's.

*See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 601 (7th Cir.2001).  If proceeding under the direct method, a plaintiff must show that he "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal link exists between the two." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013).  The indirect method requires proof that "(1) the employee engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.*  After this showing comes the familiar shifting of the burden to explain to the defendant employer, and the shifting back to the plaintiff to show that the offered explanation is pretextual.  Rangarajan is unspecific about which method he seeks to proceed under, so the Court analyzes both.

      i.      **Burden-Shifting Method**

Leaving aside the elements of the prima facie case under the burden-shifting method, Rangarajan cannot show that Caterpillar's offered reason is pretextual.  Caterpillar states that it did not promote Rangarajan to an SG 27 because the human resource department's review of his job responsibilities found that his current level, SG 26, was appropriate to those responsibilities. Cignetti Decl. 3, Cignetti Dep. 16–17.  Rangarajan's only evidence in support of his argument that the SG 26 determination was made retributively is that he had filed a complaint with Henricks and had complained to Shankar.  (While he also claims that Henricks must have known about his EEOC claim and his subsequent lawsuit, and that Shankar must have known about them too, he offers no evidence to support the claim.)  But Rangarajan does not contest Cignetti's testimony or declaration that she determined appropriate salary scales solely by comparing the roles and responsibilities of each salary grade with the job descriptions employees

provided.  Cignetti Dep. 16–17.  Nor does he contest that these recommendations were then reviewed with other human resources employees, given to Shankar, reviewed by a Senior Job Evaluator in the human resources department, and then approved by Shankar and Henricks before being finalized.  This thorough process of review by multiple people in multiple parts of the Caterpillar organization, all of whom concurred in the salary recommendations, along with lack of evidence of pretext, makes Caterpillar's offered reason wholly believable.  Rangarajan cannot succeed via the burden-shifting method.

### ii.    Direct Method

Under the direct method, the showing of a causal link must be a showing of but-for causation.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  But-for causation may be shown by things like timing, ambiguous statements of animus, evidence that other employees were treated differently, or evidence that an employer's proffered reason was pretexutal.  *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).  As explained above, Rangarajan cannot show pretext.  As to timing, it is not clear exactly when the human resources organization conducted its first quarter review of salaries, but it may well have been prior to the filing of Rangarajan's lawsuit; in any event, it is clear that the process of salary review was set in motion many months before the lawsuit was filed, and that it encompassed all of the managerial employees in PD&GT, and so was not likely to have been in and of itself retaliatory.  No complained-of action followed close on the heels of any of Rangarajan's protected activities.  As explained in the comparator discussion above, no employees can be shown to have been treated differently.  And Rangarajan has offered no statements suggesting animus against him on the part of those who made the decision, at any level.  His claim of retaliation fails under the direct method.

### d. Harassment Claim – Hoskins

Rangarajan claims that Caterpillar discriminated against him through Hoskins's behavior, including threatening his safety, saying that the India engineering team was a "job shop," playing a role in hiring Witte, grabbing his lapels, and threatening to slap him.  Resp. Mot. Summ. J. ECF No. 71 43.  But, as Caterpillar observes, Mot. Summ. J. ECF no. 51 38–40, no evidence has been produced showing that Hoffman's lapel-grabbing or slap threat were motivated by Rangarajan's race or national origin.  *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discrimina[tion]* . . . because of . . . sex.'").  Tellingly, the only link Rangarajan has between the slap-threatening and grabbing behavior and prohibited animus are one remark from years before, and her involvement in a hiring that, as the Court has already explained, has not been shown to be discriminatory.  Furthermore, all the evidence shows that when Hoskins's actions became inappropriate, Caterpillar took swift action to discipline her and protect Rangarajan.  *See Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011) ("Once aware of workplace harassment, [an] employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." (quotations omitted)).  No jury could find for Rangarajan on his harassment claim against Caterpillar for Hoskins's behavior.

### e. Motions to Seal

The parties each filed motions to seal contemporaneous with their motions for summary judgment.  The parties had previously entered into an agreed confidentiality order, ECF No. 16, including employment personnel or employment records of non-parties.  The few exhibits to the

motions for summary judgment sought to be sealed all fell within the ambit of the agreed protective order. The motions to seal these exhibits are granted.

## CONCLUSION

Accordingly, Defendant's motions for summary judgment, ECF Nos. 47, 51, are GRANTED. The parties' motions for leave to file under seal, ECF Nos. 44, 62, and 68 are GRANTED. Rangarajan's claims in this matter, and the case joined with it, 1:15-cv-01163-SLD-JEH, are all DISMISSED. No further claims remaining, the Clerk is directed to enter judgment and close the cases.

Entered this 28th day of March, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE